# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

**CEQURE COMPOSITE TECHNOLOGIES, LLC,**

    Plaintiff,

-v-                        Case No.: 2:11-cv-0175
                             JUDGE SMITH
                             Magistrate Judge King

**FASTECH, INC. AND DONCASTERS GROUP LIMITED,** *et al.*,

    Defendants.

## OPINION AND ORDER

This matter is before the Court on Defendants' Motion for Summary Judgment (Doc. 49) and Plaintiff's Motion for Partial Summary Judgment (Doc. 50). Responses and replies have been filed. This matter is now ripe for review. For the reasons that follow, the Court **DENIES** Plaintiff's Motion for Partial Summary Judgment and **GRANTS** Defendants' Motion for Summary Judgment.

## I.    BACKGROUND

Plaintiff, Cequre Composite Technologies LLC ("Plaintiff" or "Cequre"), is an Ohio Limited Liability Company whose principal place of business for many of the acts included in the Complaint was 5995 Shier-Rings Road, Dublin, Ohio 43016-1237. Since October 2012, Cequre's principal place of business has been 4440 Arville Street, #40, Las Vegas, Nevada 89103-3816. Mark Fiedler is the sole member and manager of Cequre. (Compl. ¶ 1).

Defendant, FasTech ("FasTech") is a Delaware corporation who principal place of business was 8500 Normandale Lake Blvd., Suite 1230, Minneapolis, Minnesota 55437. Ron Kalich and Mike Elia were officers of FasTech. Defendant Doncasters Group Limited ("Doncasters") is a United Kingdom Public Limited Company whose principal place of business is in Millennium Court, First Avenue, Burton-upon-Trent, Staffordshire, DE14 2WH, United Kingdom. It is also alleged that Doncasters may also be known or doing business as Dundee Holdco Limited; Doncasters PLC; Doncasters Limited; Ross & Catherall Limited; and/or Ross & Catherall (US Holdings) Limited. (Compl. ¶ 2-3).

On May 15, 2007, FasTech was purchased by Doncasters. Plaintiff alleges that FasTech has been owned by Doncasters and operated from Doncasters' United States operations located at 36 Spring Lane, Farmington, Connecticut 06032.

During the events in question, Mark Fiedler was employed by General Products Aerospace & Defense, LLC ("General Products"), a FasTech subsidiary located in Brownsboro, Alabama. Beginning in 2006, Fiedler began working with the management and marketing teams at General Products to try to generate business opportunities by using the brand name "Protec," specifically with respect to outer tactical vests and the armor used in them. (Fiedler Dep. at 61-64, 67, 73; Elia Dep. at 11-12).

Sometime prior to December of 2006, Fiedler became aware that FasTech might terminate the Protec project. Fiedler decided he might want to pursue the line of business if that occurred. According to Fiedler, "as it came into focus that FasTech didn't want it anymore and FasTech was going to do away with it, then of course I started thinking about whether or not I could do something with it." (Fiedler Dep. at 76). In December of 2006 or January of 2007,

Fiedler suggested to FasTech's CEO Paul Komaromy, "If you're going to throw it away anyway, why can't I have it?" (Fiedler Dep. at 77-78). Fiedler also approached FasTech's CFO Michael Elia with the same proposal. (Fiedler Dep. at 79). According to Fiedler, Elia said that there were assets involved and there had to be a formal transaction. So Fiedler submitted a formal written proposal to Elia. (Fiedler Dep. at 80). Elia was aware that Fiedler was on both sides of the deal, but considered Fiedler to be an honest person. (Elia Dep. at 43-44, 50). Elia stated that he was relying on Fiedler "and his knowledge of his list [Schedule 1.1 of the Purchase Agreement] of what was there. . .. Plus, at the time, Mark was working for us." (Elia Dep. at 65).

Fiedler and Elia negotiated the terms of the Purchase Agreement over a short period of time. During the course of the negotiations, Fiedler told Elia that except for 3 items shown to be "on order," all of the 30 items on Schedule 1.1, Section 5, had been paid for and were in the company's possession. Elia relied on the accuracy of Fiedler's statement. (Elia Dep. 100-01). The two also discussed that FasTech would have no open-ended or ongoing liabilities.

On February 19, 2007, Fiedler on behalf of Cequre, and Kalich and Elia on behalf of FasTech, entered into a written contract (the "Purchase Agreement"), which provided that Cequre would purchase FasTech's assets relating to the Protech Composite Technology business[1]. Fiedler's attorney prepared the Purchase Agreement with the assistance of Fiedler. (Fielder Dep. at 90-93). Section 1.1 of the Purchase Agreement titled "Transfer of Materials" refers to a series of items listed in Schedule 1.1 of the Purchase Agreement as the "Subject

---

[1] Protech consisted of a collection of assets and technology relating to the design, manufacture, testing and marketing of anti-ballistic material, explosive mine detection devices, explosive simulators and armor.

-3-

Materials" to be transferred to Cequre. This provision states:

> The parties hereto acknowledge and agree that certain of Subject Materials have been ordered, but not yet received by Seller. Seller shall remain liable to make payment of any assets listed as being "on order" in Schedule 1.1, and shall arrange to have such Subject Materials either delivered to Buyer from the manufacturer, or delivered to Buyer from Seller promptly after receipt by Seller from the manufacturer.

Section 2.1 of the Purchase Agreement addresses the "Purchase Price" for the Subject Materials, as follows:

> Buyer shall pay to Seller a deferred purchase price (the "Purchase Price") calculated as Two and One-half Percent (2.5%) of Buyer's gross revenues realized from the operation of the Business from and after the Closing Date through the date immediately preceding the second anniversary of the Closing Date (the "Payment Period"), up to a maximum aggregate payment of Two Hundred Thousand Dollars ($200,000 US).

Section 1.4 of the Purchase Agreement provides:

> Seller, at any time and from time to time after the Closing Date (as defined in Section 3.1), upon request of Buyer, will do, execute, acknowledge and deliver, all such further acts, deeds, assignment, transfers, conveyances, powers of attorney and assurances as may be reasonably requested by Buyer to confirm the conveyance, transfer, assignment and delivery of the Subject Materials to Buyer.

Section 4 of the Purchase Agreement contains a disclaimer and limitation of liability:

> BUYER ACKNOWLEDGES AND ACCEPTS THAT SELLER MAKES THE SALE HEREUNDER ON AN "AS IS, WHERE IS" BASIS AND THAT THE SELLER MAKES NO REPRESENTATIONS OR WARRANTIES, EITHER EXPRESS OR IMPLIED, WITH REGARD TO THE RIGHTS GRANTED HEREIN OTHER THAN AS EXPRESSLY SET FORTH IN SECTION 2.2, AND THAT TO THE FULLEST EXTENT OF THE LAW, SELLER EXPRESSLY DISCLAIMS ANY AND ALL IMPLIED REPRESENTATIONS OR WARRANTIES, INCLUDING ANY WARRANTY OF THE ADEQUACY, THE MERCHANTABILITY OR THE FITNESS FOR A PARTICULAR PURPOSE OF THE SUBJECT MATERIALS, OR NON-INFRINGEMENT WITH RESPECT TO THE USE OF THE SUBJECT MATERIALS IN THE BUSINESS.
>
> IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY

> OR ANY THIRD PARTY FOR INCIDENTAL, INDIRECT, SPECIAL OR CONSEQUENTIAL DAMAGES OF ANY KIND, EVEN IF SUCH PARTY WAS ADVISED OR AWARE OF THE POSSIBILITY OF SUCH DAMAGES. IN NO EVENT SHALL ANY PARTY'S LIABILITY TO THE OTHER HEREUNDER EXCEED THE PURCHASE PRICE.
>
> EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT THE FOREGOING DISCLAIMERS AND LIMITATIONS OF LIABILITY FORM AN INTEGRAL PART OF THE BARGAIN OF THE PARTIES WITH RESPECT TO THE TRANSACTIONS CONTEMPLATED HEREUNDER, AND THAT WITHOUT SUCH LIMITATIONS, NEITHER PARTY WOULD HAVE ENTERED INTO THIS AGREEMENT.
>
> Finally, the Purchase Agreement includes the following merger and integration clauses:
>
> 6.1 <u>Entire Agreement</u>. This Agreement contains the entire understanding between the parties and supersedes all prior understandings or agreements between them regarding the subject matter hereof. There are no other agreements, arrangements, or understandings oral or written, between the parties relating to the purchase and sale of the Subject Materials that are not contained herein.
>
> 6.5 <u>Amendment</u>. This Agreement may not be amended, waived or discharged, except in a written document executed by both of the parties to this Agreement.

(Attached as Ex. A to Defs.' Mot.).

Fielder established Cequre as an entity around the same time he executed the Purchase Agreement in 2007, and he remains the sole member of Cequre. Fiedler continued working for General Products and its affiliated companies into 2009. (Fiedler Dep. at 30-35, 49-50, and 55-56). Fiedler in his position with General Products or FasTech was given the responsibility to transfer the Subject Materials to Cequre and document the deliveries. Cequre, however, has no records of any items shipped to Cequre's facility in Columbus, Ohio. (Fiedler Dep. at 110-12, 126, 139-43; Elia Dep. at 59).

Cequire acknowledges receipt of all of the items identified as numbers 1 through 4 on Schedule 1.1, as well as 15 of the 30 items listed in number 5 of Schedule 1.1. Cequre did not

pay FasTech anything for these items which Fiedler values at between $137,300.00 and $153,450.00. (Fiedler Dep. at 134-35, 147-51). Plaintiff now alleges in this case that Defendants have failed to deliver certain assets listed in Schedule 1.1 that were not yet in FasTech's possession at the time the Purchase Agreement was executed. Those assets include:

    a. Two (2) M4 Tactical Rifles.
    b. Two (2) M16/AR15 Tactical Rifles.
    c. Two (2) 308 Sniper Rifles.
    d. Five (5) sets of scopes, rails for each calibration weapon.
    e. Five (5) EOTech devices.
    f. All Dahlgren – Test reports / certifications.
    g. JD White – Test reports.
    h. Two (2) US Army "Mosaic" uniforms.
    i. Three (3) pair USMC combat boots.
    j. Two (2) Picatinny rail systems with accessories.
    k. One (1) Tradeshow booth.
    l. One (1) Laptop computer & printer.
    m. One (1) Composite labeling machine.
    n. All mine detection devices.
    o. All mine trigger disarmament devices.

Plaintiff asserts one claim for breach of contract against Defendants based on the alleged failure to deliver the assets listed above. Plaintiff claims that it should be paid $1,543,331.00 for these 15 items that it claims were never delivered, despite not paying anything for any of the items it received. (Fiedler Dep. at 180). It is undisputed that after the execution of the Purchase Agreement in February 2007, there was never any written communication of any kind prior to this case being filed in February 2011, advising FasTech that the items were never delivered or that there was a breach of the Purchase Agreement.[2]

---

[2] The Background section is comprised of Defendants' summary and Plaintiff's Complaint, as well as excerpts from the cited depositions. In opposing Defendants' Motion, Plaintiff states that it "disagrees" with Defendants' facts and "need not waste the court's time refuting them in detail." (Pl.'s Memo. in Opp. at 2). Rule 56(e) of the Federal Rules of Civil Procedure specifically provides: "If a party . . . fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and

-6-

## II. STANDARD OF REVIEW

The standard governing summary judgment is set forth in Rule 56 of the Federal Rules of Civil Procedure, which provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Summary judgment will not lie if the dispute about a material fact is genuine; "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is appropriate, however, if the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *See Muncie Power Prods., Inc. v. United Techs. Auto., Inc.,* 328 F.3d 870, 873 (6th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)); *see also Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986).

When reviewing a summary judgment motion, the Court must view all the facts, evidence and any inferences that may permissibly be drawn from the facts, in favor of the nonmoving party. *Matsushita*, 475 U.S. at 587. The Court will ultimately determine whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby*, 477 U.S. at 251-53. Moreover, the purpose of the procedure is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried. *Lashlee v. Sumner*, 570 F.2d 107, 111 (6th Cir. 1978). The Court's

---

supporting materials–-including the facts considered undisputed–-show that the movant is entitled to it; . . .." Accordingly, Plaintiff has not alleged any genuine issues of material fact that remain in dispute.

duty is to determine only whether sufficient evidence has been presented to make the issue of fact a proper question for the jury; it does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. *Liberty Lobby*, 477 U.S. at 249; *Weaver v. Shadoan*, 340 F.3d 398, 405 (6th Cir. 2003).

In responding to a summary judgment motion, the nonmoving party "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989) (*quoting Liberty Lobby*, 477 U.S. at 257). The existence of a mere scintilla of evidence in support of the opposing party's position is insufficient; there must be evidence on which the jury could reasonably find for the opposing party. *Liberty Lobby*, 477 U.S. at 252. The nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Phillip Morris Companies, Inc.*, 8 F.3d 335, 340 (6th Cir. 1993). The Court may, however, enter summary judgment if it concludes that a fair-minded jury could not return a verdict in favor of the nonmoving party based on the presented evidence. *Liberty Lobby*, 477 U.S. at 251-52; *see also Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

Moreover, "[t]he trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street*, 886 F.2d at 1479-80. That is, the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact. *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001).

## III. DISCUSSION

Plaintiff Cequre brings one claim for breach of contract against Defendants FasTech and Doncasters. Both parties have moved for summary judgment. Before considering the merits of Plaintiff's breach of contract claim, the Court will first consider the arguments raised by Defendants asserting that Plaintiff's claim is barred for failing to provide notice of the alleged breach of contract; Plaintiff has no cognizable damages; and Plaintiff's claims are capped by the Purchase Agreement's limitation of liability provision. The Court will address these arguments in turn.

### A. Notice of Alleged Breach of Contract

Defendants argue that Plaintiff failed to provide timely notice of the alleged breach of the Purchase Agreement as required by the Uniform Commercial Code, Ohio Revised Code §§ 1302.61, 62, 64, and 65. Ohio Revised Code § 1302.61 provides: "Rejection of goods must be within a reasonable time after their delivery or tender." Ohio Revised Code § 1302.62 sets forth a purchaser's duties when rejecting non-conforming goods. Ohio Revised Code § 1302.64 defines what constitutes an acceptance of goods. Finally, Ohio Revised Code §1302.65 requires the "buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy." Defendants argue that Cequre is barred from any remedy because it failed to complain or object to the alleged non-delivery of these goods over the past four years.

Plaintiff, however, argues that the aforementioned sections of the UCC only apply to breach of contract for non-conforming goods that are actually delivered and/or accepted by the purchaser. Plaintiff asserts that those provisions do not apply to FasTech's failure to provide the

undelivered assets because those items were never presented to Cequre for acceptance.

Both parties reference the Sixth Circuit's decision in *Roth Steel Prods. v. Sharon Steel Corp.*, 705 F.2d 134 (6th Cir. 1983). In *Roth Steel*, defendant Sharon argued that Roth Steel's failure to give notice of breach as required by Ohio Revised Code § 1302.65(C)(1) bars them from seeking a remedy. With respect to items that were ordered but never delivered, the district court held that notice of the breach was not necessary because section 2-607 of the UCC requires notice only with regard to accepted goods. *Roth Steel*, 705 F.2d at 151. This is the same argument Plaintiff asserts in the case at bar.

The Sixth Circuit *Roth Steel* first analyzed whether any notice is required. Disagreeing with plaintiffs contention that the UCC only requires notice when the breach cannot be readily discovered because the tendered goods possess a latent defect, the Sixth Circuit held that Ohio Revised Code § 1302.65(C) (UCC Section 2-607(3)) requires notice of breach to be given "within a reasonable time after [the buyer] discovers or should have discovered *any breach*. . .." (Emphasis in original). "The clear language 'any breach' indicates that the statute applies to all breaches in which goods are accepted." *Roth Steel*, 705 F.2d at 152.

Plaintiff, however, questions Defendants reliance on *Roth Steel* because the notice requirement of any breach only applies to goods that were accepted, whereas the case at bar involves non-delivered goods. The *Roth Steel* opinion casts doubt on Plaintiff's contention. The Court suggests that notice of breach should be given any time after the buyer discovers or should have discovered any breach. However, Plaintiff is not incorrect in that there is still the language "in which goods are accepted." The Sixth Circuit emphasized in both *Roth Steel* and *Standard Alliance Indus., Inc. v. Black Clawson Co.*, 587 F.2d 813 (6th Cir. 1978), that "express notice

-10-

opens the way for settlement through negotiation" and "proper notice minimizes the possibility of prejudice to the seller by giving him 'ample opportunity to cure the defect, inspect the goods, investigate the claim or do whatever may be necessary to properly defend himself or minimize his damages while the facts are fresh in the minds of the parties." 705 F.2d at 152.

There is no question that the clear language of the statute applies to situations in which goods are accepted. However, the Sixth Circuit also suggests that notice should be provided in "any breach" to allow the opportunity to cure. Defendants in this case clearly were not given that opportunity. "This requirement of seasonable notice serves the same policy objectives as the requirement of timely rejection as such. . . . [S]ince notice is meant to give the seller a chance to cure, courts frown upon 'notice through legal papers.'" James J. White, Robert S. Summers, White and Summers' Uniform Commercial Code §8.3 at p. 553 (5th ed. 2006).

Defendants argue, and the Court agrees that "[a]t some point in time, a seller should be able to safely conclude that products were delivered and should not have to wait four years to learn that there were problems with delivery." (Defs.' Reply at 10). Allowing Plaintiff to bring this claim would clearly undermine the purposes of Ohio Revised Code § 1302.65 and those set forth in the aforementioned Sixth Circuit decisions.

This reasoning is further supported by the fact that Fiedler, owner of Cequre, was involved in the ordering and delivery of the assets at issue while still employed with Defendant FasTech. Therefore, Cequre, through Fiedler, had a reasonable opportunity to inspect the items. (Fiedler Dep. at 86-87, 109-10, 137-38, 161-62, 168). A party is deemed to have accepted goods under the UCC pursuant to Ohio Revised Code §1302.64(A)(1) when "the buyer fails to make an effective rejection as provided in division (A) of § 1302.61 of the Revised Code, but such

acceptance does not occur until the buyer has had a reasonable opportunity to inspect them." Therefore, Plaintiff Cequre is deemed to have accepted the goods.

After having concluded that Plaintiff is deemed to have accepted the good in question, Defendants argue that Plaintiff failed to seasonably notify them of the non-delivery of products. Defendants argue that waiting over four years should not qualify as seasonable notice. Further, courts have consistently found that providing notice through legal papers is insufficient notice under § 2-607 of the UCC. *See Gast v. Rogers-Dingus Chevrolet*, 585 So.2d 725 (Miss. 1991) ("notice by initiation of legal proceedings does not satisfy the statutory mandate").

Courts have construed seasonable notice in terms of days, not years. In *Futronics, Inc. v. Ohlman Farm & Greenhouse, Inc.*, 1996 Ohio App. LEXIS 1663 (6th App. Dist. 1996), the court found that a complaint made a week to 10 days after delivery did not qualify as seasonable notice that the goods were being rejected. Likewise, in *Alliance Wall Corp. v. Ampat Midwest Corp.*, 17 Ohio App.3d 59, 65-66 (8th App. Dist. 1984), the court found that a buyer who did not notify a seller of any defects for 25 days failed to give proper notice. Finally, in *Hooten Equip. Co. v. Trimat, Inc.*, 2004 Ohio 1128 (4th App. Dist. 2004), the court found that a delay of approximately 11 months after delivery was inadequate notice.

In the four years since the Purchase Agreement was signed and the goods were not received, Cequre had the opportunity to notify FasTech of the alleged breach, but failed to do so. Defendants acknowledge that Fiedler made comments such as "this stuff is due and pending" and about "open contractual obligations," however, there is no evidence that Defendants were on notice that it was considered to be in breach of the Purchase Agreement. The absence of any written notice weighs heavily in favor of failure to provide notice. "Although the Code does not

require written notice, those who have depended on non-written notice, or an equivocal notice, have not fared well in courts." White & Summers, §8.3, p. 552-53.

In conclusion, the Court agrees with Defendants that Cequre had the opportunity to inspect the goods through Fiedler, is deemed to have accepted them, and failed to provide seasonable notice of any alleged breach. Therefore, Defendants are entitled to judgment on Plaintiff's breach of contract claim.

### B. Damages for Alleged Breach

Defendants correctly assert that Plaintiff bears the burden of producing admissible and competent evidence on the issue of damages. However, Defendants argue that Plaintiff does not have any cognizable damages. First, Fiedler admitted that he did not place a value on the missing assets at or around the time the Purchase Agreement was executed. (Fiedler Dep. at 87). Next, Defendants clearly did not consider the Protec assets to be valuable as they were ready to throw it all away until Fiedler approached them. Finally, Plaintiff Cequre had no out of pocket costs or damages because it never paid a penny to FasTech under the Purchase Agreement.

The Court therefore agrees with Defendants that Plaintiff has failed to adduce any admissible evidence of damages and Plaintiff's breach of contract claim must also be dismissed on this alternative basis.

Having found in favor of Defendants, the Court need not address Defendants' final argument regarding the limitation of liability provision, nor Plaintiff's motion.

## IV. CONCLUSION

Based on the foregoing, the Court **GRANTS** Defendants' Motion for Summary Judgment and **DENIES** Plaintiff's Partial Motion for Summary Judgment.

The Clerk shall remove Documents 49 and 50 from the Court's pending motions list.

**IT IS SO ORDERED.**

    */s/ George C. Smith*
**GEORGE C. SMITH, JUDGE**
**UNITED STATES DISTRICT COURT**